UNITED STATES *v.* AMERICAN TEXTILE ENGINEERING, INC. (No. 4131)[1]

---

[1] T. D. 49597.

United States Court of Customs and Patent Appeals, May 2, 1938

*Charles D. Lawrence*, Acting Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

*B. A. Levett* for appellee.

[Oral argument April 11, 1938, by Mr. Lawrence and Mr. Levett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:[2]

This is an appeal from a judgment of the United States Customs Court, Second Division, holding imported parts of a so-called Hygrolit machine dutiable as parts of "all other machines," not specially provided for, at 27½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930, as claimed by the importer-appellee, rather than as parts of textile machinery at 40 per centum ad valorem under that paragraph, as assessed by the collector at the port of Boston, Mass.

The pertinent part of paragraph 372 reads:

* * * all other textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; * * * all other machines, finished or

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

unfinished, not specially provided for, 27½ per centum ad valorem: *Provided*, That parts, not specially provided for, wholly or in chief value of metal or porcelain, of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts * * *.

The hygrolit machine is used in steaming yarn and spraying it with a solution known as "Hygrolit." It is comparatively large, and apparently acquires its name from the fact, as stated in the brief of counsel for appellee, "that its main use is to spray a chemical liquid called Hygrolit over materials or articles caused to pass beneath a mechanism forming part of the machine, and operating to spray the liquid evenly over the material or articles carried beneath it." Counsel for appellee further described the machine and its operation in his brief as follows:

The yarn is brought to the machine already wound on cops or tubes * * * in duffel-boxes, and then put into the machine through a feeding arrangement * * * consisting of a hoist, which feeds the yarn into a steam chamber. There it undergoes a very short steaming process * * *. The yarn then drops down onto an endless moving platform or carrier which brings it under the spray.

The machine in question in the earlier suit [*American Textile Engineering, Inc.,* v. *United States,* T. D. 47808, 68 Treas. Dec. 95, the record in which case was made a part of the record in this case] did not have the steaming attachment, and the yarn was not steamed in the machine. The hoist dumped the copped yarn directly on to the carrier to be sprayed with the Hygrolit chemical.

The spraying, as described by the witness Dulken on page 11 of the record, appears to be accomplished through a mechanism consisting of scrubber rollers which draw the solution to be used in spraying from a trough. Brushes revolve in an opposite direction from that of the rollers against the rollers and spray the liquid from the rollers to the yarns passing beneath.

After passing under the spray the copped yarn drops automatically off the end of the carrier into empty duffel-boxes, and the operation is finished * * *. The excess liquid is recovered, strained and pumped back into the spraying tank * * *.

The witness Francis H. Bellevue, a customs examiner, who officially examined the involved merchandise, testified for the Government. His testimony relative to the operation of a hygrolit machine is as follows:

The WITNESS. * * * the yarn is spread into the footing or into the machine, and put through the first section of it, which is a steam box, and sprayed with hot water or steam; drops down into the second section, which is an affair 8 inches lower than the other affair. In that section it is sprayed with a liquid known as hygrolit and water.

Judge KINCHELOE. You mean this machine is doing all that now?

The WITNESS. Yes, sir; that goes through the second section, and it is discharged on to an apron and dropped in the tubs or buckets and it is taken away.

The process of steaming yarn and spraying it with the hygrolit solution is a "yarn conditioning" process, or, as stated by the witness Dulken, president of the importing company, a process called "chemical conditioning," and lessens the tendency of the yarn to kink by "setting the twist." The moisture gives the yarn elasticity and strength-

ens it, and, although the yarn is cleaned to some extent, that is not the purpose of the process. Clean yarn, having a tendency to kink, is, according to the statements of counsel for appellee at the time of the oral arguments in this court, subjected to the hygrolitic process. That process is not used by all manufacturers; some condition yarn by aging it in a "humidified room." The conditioning of yarn, as stated by the witness Forty, who testified for the Government, is "a necessary process [for some yarns at least] in the manufacture of textiles," and prepares it for the next step—that of manufacturing it into knitted or woven fabrics.

It clearly appears from the evidence of record that, although the hygrolitic conditioning process *advances yarn in condition* for use in weaving or knitting, and; to some extent, changes its characteristics, the resultant product is still yarn. It is not a manufacture of yarn, nor is it yarn manufactured into a new and different article having a new name, character, or use from that of yarn.

In the case of *Anheuser-Busch Assn.* v. *United States*, 207 U. S. 556, 562, the Supreme Court held that corks, subjected to an elaborate process of cleaning and coating in order to adapt them to a special use, were not converted into new articles having a new name, character, or use within the purview of section 25 of the tariff act of 1890. The statute there involved provided for a drawback of 99 per centum of the amount of duties paid on imported materials which were "used in the manufacture of articles manufactured or produced in the United States," and exported to foreign countries. In so holding, the court said, *inter alia:*

Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft* v. *Wiegmann*, 121 U. S. 609. There must be transformation; a new and different article must emerge, "having a distinctive name, character, or use."

The decisions of the Supreme Court in that case and in the case of *Hartranft* v. *Wiegmann*, 121 U. S. 609, referred to in the quoted excerpt, have been followed by this court in many cases where applicable. See *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, and cases cited therein.

In the case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, this court, in holding that certain machines used for tearing apart fleeces of wool and for washing and drying the wool were not textile machines and not dutiable as "textile machinery" under paragraph 372 of the Tariff Act of 1922, quoted from our decision in the case of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490, and said:

We thus expressed the opinion that the phrase "all other textile machinery" includes machines which are used in the *manufacture* of textile materials.

If this be the test, and we think it is, are the machines imported here used in the *manufacture* of textile materials? Obviously, they are not. Ever since the creation of this court it has held, consistently, that the mere cleansing of an article, or "getting it by itself," is not a manufacturing process. This rule is so well understood that it requires no elaboration here. ·

The decision in that case was followed and approved in the cases of *Jett & Co.* v. *United States,* 18 C. C. P. A. (Customs) 86, T. D. 44044, and *Edward Jefferson (Inc.)* v. *United States,* 18 C. C. P. A. (Customs) 322, T. D. 44583.

In the *Jett & Co.* case, *supra,* it was held that machines which were "integral parts of an installation which treats raw material, cotton linters, through various stages to produce a yarn used in the production of textiles," were dutiable as textile machinery under paragraph 372 of the Tariff Act of 1922. We there said, *inter alia:*

They [the machines in question] are used exclusively in the manufacture of artificial silk, which is of course a textile material. The process performed by each of the machines is essential in the manufacture of such material. In our opinion it is wholly immaterial that the processes resulted in the creation of a new fiber. · The raw material utilized in the beginning is a textile fiber. The manufactured article, the result of a large number of processes between the raw textile fiber and the finished product, is artificial silk yarn. Thus the manufacturing processes begin by utilizing a textile fiber and end with an artificial silk yarn. It is immaterial whether in such processes the original fiber has been destroyed and a new fiber created. It is likewise immaterial that the machines in question do not perform all of the manufacturing processes necessary in the production of the yarn. All of them were used in its manufacture. The manufacture of the yarn begins with one of the machines in question and the sole end of the processes employed is the production of artificial silk yarn.

In the *Edward Jefferson (Inc.)* case, *supra,* it was held that certain "backwashing machines and parts thereof," used to wash and dry wool slivers (the purpose of the washing being to remove an "ingredient previously injected, this injection being itself for a manufacturing purpose"), were dutiable as "textile machinery or parts thereof" under paragraph 372 of the Tariff Act of 1922.

It is contended by counsel for the Government that the conditioning process, hereinbefore described, is a manufacturing process; that the hygrolit machine is used in the manufacture of textile materials; that it is a textile machine within the purview of our decision in the *Passaic Worsted Co. et al.* case, *supra;* and that, therefore, the involved articles are parts of textile machinery and dutiable as such under paragraph 372, *supra.*

It is argued by counsel for appellee that the hygrolitic process is not a manufacturing process, because it does not produce a new article having a new name, character, or use, and that as this court held in the *Passaic Worsted Co. et al., Jett & Co.,* and *Edward Jefferson (Inc.)* cases, *supra,* that the provisions for textile machinery in paragraph 372 of the Tariff Act of 1922 were intended to include only

such machines as were used in the manufacture of textile materials and as those provisions are substantially the same as those here under consideration, the hygrolit machine, of which the involved articles are parts, is not a textile machine.

Counsel for appellee relies upon the principles of law announced by the Supreme Court in the *Anheuser-Busch Assn.* and *Hartranft* cases, *supra*.

The real question before us is whether the principles announced in those cases are applicable to the issues here presented.

It should be borne in mind that the statutory provision is not for machines used in the manufacture of textile materials, but is a broad sweeping provision covering all textile machinery, not specially provided for.

It may be that the language used in the *Passaic Worsted Co. et al.* case, *supra*, restated and followed in the *Jett & Co.* and *Edward Jefferson (Inc.)* cases, *supra*, is open to the interpretation placed upon it by counsel for appellee. However, as is apparent from our decision in the latter case, this court, in stating in those decisions that a textile machine was one used in the manufacture of textile materials, did not mean to be understood as holding that *only such machines as actually converted a material into a new material or article having a new name, character, or use* were intended by the Congress to be included within the statutory provisions for all other textile machinery.

It may require more than one manufacturing process to convert a textile material into a new textile material having a new name, character, or use. Indeed, it appears from the Summary of Tariff Information, 1929, Vol. 1, pp. 823–835 (prepared by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives), that many machines referred to therein as textile machinery, such as "machines for winding both raw silk and spun silk, as well as rayon, into various forms, bobbins, cops, skeins, 'beams' and there are other shapes for dyeing, or weaving in the loom," have nothing whatsoever to do with changing the character of the material on which they operate.

However, it appears from the record in the instant case that it is necessary to subject some yarns to the hygrolitic process, or one somewhat similar, to prepare them for use in knitting or weaving textile materials. The hygrolitic process actually changes the character of the yarn; gives it elasticity; strengthens it; and lessens its tendency to kink by "setting the twist."

Surely, a machine which performs such functions and produces such results on a textile material was intended by the Congress to be included in the provision for "textile machinery" contained in paragraph 372, *supra*.

Some argument is made by counsel for appellee that the involved machines are not used exclusively in the textile industry, but are also used to moisten tobacco and paper.

It is true that the importer's witness Dulken stated that the hygrolit machine is used in the tobacco and paper industries for moistening tobacco and paper. The extent of that use, however, was not stated by the witness, nor does it appear from the record that such machines have any substantial use other than that of processing textile materials. Accordingly the question of whether a textile machine is one used exclusively, chiefly, or only substantially in the various processes of manufacturing textile materials, is not before us for consideration, and we express no opinion with regard thereto.

For the reasons stated, the judgment is *reversed*.